IN RE PETITION OF ROBERT A. RITCHIE FOR
ADOPTION OF ANTHONY JAMES RITCHIE.
ROBERT A. RITCHIE v. CHILDREN'S
HOME SOCIETY OF ST. PAUL.

216 N. W. 2d 900.

April 12, 1974—No. 44559.

*Broeker, Bachman & Zerby* and *R. Walter Bachman, Jr.*, for appellant.

*Alexander L. Janes* and *Keith D. Kennedy*, for respondent.

Heard before Knutson, C. J., and Otis, MacLaughlin, and Mulally, JJ., and considered and decided by the court.

EDWARD D. MULALLY, JUSTICE.*

This appeal brings into question the denial by the Hennepin

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

County District Court, Juvenile Division, of the petition of Robert A. Ritchie for the adoption of Anthony James Ritchie.

Anthony Ritchie, a male child, was born on October 21, 1969, in New York City. On April 28, 1970, his mother surrendered the child to the commissioner of social services of New York City for adoption. The commissioner transferred custody and control to the Catholic Home Bureau for Dependent Children in New York City on February 8, 1972.

Robert Ritchie, an unmarried male living in Bloomington, Minnesota, made application to adopt a child through the Children's Home Society of St. Paul (C. H. S.) in January 1971. On February 23, 1972, the commissioner of public welfare of Minnesota authorized the placement of the child in Ritchie's home. In March 1972, C. H. S., acting as guardian on behalf of the Catholic Home Bureau, advised Ritchie to proceed to New York to arrange for adoptive custody of the child.

Upon receiving the child from the Catholic Home Bureau, Ritchie signed an agreement which stated that the child was being placed "for the purpose of providing a permanent home for it," but reserving "the right to remove the child previous to legal adoption if at any time the circumstances of the home are found to be in its judgment injurious to the physical, mental and moral well-being of the child."

On March 4, 1972, Ritchie signed a "Placement Agreement" with C. H. S., which in part said: "If either the Society or the adoptive parents conclude that it would be best for the child or for the adoptive parents that the child be removed from the home prior to legal adoption, both parties will cooperate in such action." Ritchie formally petitioned the court to adopt the child on September 28, 1972.

On November 22, 1972, C. H. S. recommended that the child be removed permanently from petitioner's home. On November 30, 1972, the Catholic Home Bureau rescinded its agreement with petitioner. The primary reason for termination was excessive physical discipline.

Ritchie continued with his petition and the matter was heard in the Hennepin County District Court, Juvenile Division. On May 22, 1973, the trial court denied the petition because "[t]here is no evidence that the guardian has consented in a manner complying with M. S. 259.24, Subd. 5."

On June 20, 1973, Ritchie moved for a new trial or for amended findings and conclusions. On July 5, 1973, the lower court reaffirmed its denial of Ritchie's petition but amended its findings of fact to read: "Petitioner is ready, willing and able to provide care, love and custody to the child, and the child's interests would be well served by adoption by Petitioner." On July 30, 1973, Ritchie appealed to this court from the July 5 order.[1]

Some time after receiving the 3-year-old child, Ritchie enrolled him in the Learning Tree Nursery in Bloomington, Minnesota. In the early summer, Ritchie slapped the child for using foul language, and an attendant at the nursery school testified she saw the handprint on the child's face. In late September or early October, Ritchie strapped the child five or six times with a belt, aiming at the child's buttocks, for having had a bowel movement in his pants. Ritchie contends that he was advised to use the belt by the mother of one of the other children in the nursery school.

On October 17, 1972, the Hennepin County Welfare Department, Child Protective Services, learned that a teacher at the nursery school had reported that the Ritchie child had bruises and welts on his back and bottom. Following investigation, the department recommended that the child be removed from Ritchie temporarily while a further evaluation was completed.

On October 19, 1972, C. H. S. received a report from the adoption unit of the Department of Public Welfare "that there had

---

[1] Appellate jurisdiction for adoption proceedings is specifically covered by Minn. St. 259.32, which reads as follows: "Any order, judgment, or decree of a court pursuant to the provisions of sections 259.21 to 259.32 may be appealed to the supreme court by any person against whom any such order, judgment, or decree is made or who is affected thereby as are appeals from said court in other matters."

been a report of abuse of the child which consisted of use of the belt, inflicting some marks on the child." An employee of C. H. S. talked to Ritchie, who admitted that he had struck the child about six times and that the reason he had done it was because "he had a rough day, and when he came home he found that Tony [the child] had wet his pants."

Dr. Robert H. Bugenstein, a medical doctor specializing in pediatrics, saw the child on October 19, 1972. Ritchie furnished Dr. Bugenstein authorizations to give full information to C. H. S. and the Hennepin County Welfare Department. Accordingly, Dr. Bugenstein forwarded a copy of his medical report to C. H. S. The examination showed that the child had three or four crusted abrasions on his back and upper buttocks, about an inch and a half by an inch in size, and of a severe type. In Dr. Bugenstein's opinion, "it would be a rather severe strapping to cause an abrasion type of wound with a belt." The doctor said that he would have reported this matter to the authorities as a child-abuse case on his own initiative.

Dr. Edwin C. Burklund, a specialist in pediatrics and the pediatrician for C. H. S., examined the child on November 7, 1972. He found four depressed abrasions on the child's back and chest which were three-fourths of an inch in diameter, one-sixteenths of an inch deep.

Based upon his reading of petitioner's profile obtained in a Minnesota Mutliphasic Personality Inventory test, Dr. Richard R. Friberg, a certified consulting psychologist, found that petitioner was an individual who could not "deal particularly well with extremely stressful or emotional situations." He predicted that Ritchie "would feel guilty about it and try extremely hard for a period of time to inhibit those impulses, but the anger and the potential disorganization under stress indicated by the profile would predict further acting out in the future despite the guilt and the remorse."

Dr. Robert ten Bensel is a medical doctor specializing in pediatrics, a writer and lecturer in the field of child maltreatment,

and an associate professor of pediatrics in the School of Public Health at the University of Minnesota. In 1963, he received an award for an article on the battered-child syndrome. Dr. ten Bensel examined the child on March 22, 1973, at the request of C. H. S., relative to allowing the child to be placed permanently in the Ritchie home as an adopted child. He thought it would be "extremely hazardous for Anthony Ritchie to be placed in a situation that could lead to further harm based upon the evidence that I have seen and reviewed."

Testimony by petitioner's witnesses indicated that they believed Ritchie's behavior and resources were such that he was a fit person to furnish care, love, and support for the child.

As previously stated, the trial court denied Ritchie's petition for adoption because there was no evidence that the guardian had consented in a manner complying with Minn. St. 259.24. The trial court made no finding that the withholding of consent by the agencies was arbitrary or unreasonable, but found that "Petitioner is ready, willing and able to provide care, love and custody to the child, and the child's interest would be well served by adoption by Petitioner."

The trial court in a memorandum summarized its position:

"The Court was urged to extend the doctrine of Fleming v. Hursh [In re Petition of Fleming, 271 Minn. 337, 136 N. W. 2d 109 (1965)] to require not only that public agencies act reasonably in giving or withholding consent to adoption but that private agencies also be required. It appears to the Court that the extension of such a doctrine, however wholesome it may be in the interests of the children of Minnesota, should be the prerogative of the Supreme Court since it is beyond the direct contemplation of the statute. It is urged that if the Supreme Court pass upon the extension it also, by holding or dictum, express itself as to whether natural parents should also be required to act reasonably in granting or withholding their consent."

The issue before this court is: Does Minn. St. 259.24 deprive

the trial court of jurisdiction to conduct a hearing and consider the best interests of a child as they relate to the granting or denying of a petition for adoption, even though consent has been refused or rescinded by a private agency which, as guardian of the child, has entered into a placement agreement with the prospective adoptive parent? We hold that it does not.

Minn. St. 259.24, subd. 1, so far as pertinent here, provides:

"No child shall be adopted without the consent of his parents and his guardian, if there be one, except in the following instances:

\* \* \* \* \*

(f) The commissioner or agency having authority to place a child for adoption pursuant to section 259.25, subdivision 1, shall have the exclusive right to consent to the adoption of such child."

Minn. St. 259.24, subd. 5, provides in part:

"All consents to an adoption shall be in writing, \* \* \* and shall be filed in the adoption proceedings at any time before the matter is heard \* \* \*."

The issue as it relates to public agencies (the commissioner of public welfare) was considered by this court in In re Petition of Fleming, 271 Minn. 337, 136 N. W. 2d 109 (1965), and was answered in the negative. In that case the mother of an illegitimate child consented to the child's commitment to the commissioner of public welfare. The commissioner of public welfare entered into a placement agreement with prospective foster parents. After the child had lived with the prospective foster parents for a reasonable time during a supervisory period, the commissioner informed them that the child was to be removed. The foster parents immediately filed a petition in the lower court to adopt the child on the grounds that it was in the best interests of the child to do so. This court held that the trial court had jurisdiction to consider the matter primarily for the purpose of

determining what was in the child's best interests. The court said:

"We conclude that under the agreement here the juvenile court had jurisdiction to consider the question of the best interests of the child. It seems to us that when the commissioner entered into such an agreement with the respondents, left the child in their home for 18 months or more, and then informed them that the child was to be removed, the prospective foster parents, who promptly petitioned to adopt the child, should have the right at least to be heard in court on the matter of whether the commissioner's proposed removal and his refusal to consent to her adoption was really in the best interests of the child. To hold otherwise would, in our opinion, give the commissioner an arbitrary power which, if he chose to use it, would leave no redress to the parties who had cared for and supported the child during the supervisory period under the impression, at least, that they could eventually adopt her. While we might assume that the commissioner, in ordering a removal of the child, would be acting in good faith and in her best interests, we think that the respondents should be given a chance in court to present evidence as to why they believe that it would be in her best interests to be adopted by them." 271 Minn. 344, 136 N. W. 2d 113.

We conclude that there is no rational basis upon which a distinction can be made between public and private agencies in matters of this type. We hold that the Fleming doctrine applies to both public and private agencies, and that when a private agency, as guardian, has entered into a placement agreement relative to the adoption of a child and then refuses to give or withdraws its consent to the adoption, Minn. St. 259.24 does not deprive the trial court of jurisdiction to hear the matter and to grant the petition if the court finds that it would be in the best interests of the child to do so.

The trial court also urges this court, by holding or dictum, to express itself as to whether this holding extends to natural par-

ents. The issue is not before us and we decline to rule upon it at this time.[2]

This matter is not before us directly on the merits. However, in light of the expert testimony in the record, we feel compelled to admit to considerable apprehension as to whether the welfare and best interests of this child will be served in the event the petition is granted. We urge that the trial court carefully consider and reevaluate the evidence before entering its final order.

Reversed and remanded.

MR. CHIEF JUSTICE SHERAN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

[2] Since the preparation of this opinion, the legislature has added a subdivision to Minn. St. 259.24, effective after July 1, 1974, which reads: "Consent to an adoption shall not be unreasonably withheld by a guardian, who is not a parent of the child, by the commissioner or by an agency." L. 1974, c. 66, § 4.